Rup, Mary-Lou, J.

Background

[1]

In August 1997, a Hampden County jury convicted the defendant of two counts of first degree murder by reason of extreme atrocity or cruelty in the d'eaths, on or about July 5, 1996, of Amy Smith, the defendant’s estranged woman friend, and their daughter, Destiny Smith. The Supreme Judicial Court affirmed the convictions. Commonwealth v. Fickling, 434 Mass. 9 (2001).
Thereafter, in 2003, the defendant filed a motion for new trial. He filed a renewed motion for a new trial in 2005 and a motion for new trial in 2007.1 denied each of those motions. In his 2003 and 2005 motions, the defendant asserted newly discovered exculpatory evidence related to the May 2000 first degree murder convictions of Alfred Gaynor (“Gaynor”), charged as a “serial killer” in the deaths of Joanne Thomas (on or about November 1, 1997), Loretta Daniels (on or about February 2, 1998), Rosemary Downs (on or about February 11, 1998) and Joyce Dickerson (on or about February 18, 1998).[2],[3] Related to those motions, the defendant also filed motions seeking, inter alia, court orders: (1) permitting DNA testing of a hair found at the scene of the Smith killing; (2) that the Commonwealth preserve certain evidence and conduct comparative testing of hair samples and fingerprints found at the scene of the Smith killing to hair samples and fingerprints of Gaynor; (3) permitting his counsel to review impounded transcripts of a hearing in which Gaynor’s trial counsel on some of the indictments (Attorney Linda Thompson) sought to withdraw;[4] and (4) granting access for his counsel to review exhibits introduced during the Gaynor trial. Since 2002, the defendant has persistently asserted that the discovery he sought would exonerate him and link Gaynor (his biological uncle) to the Smith deaths, which he argued had a “commonality” to the four murders of which Gaynor had been convicted. The earlier motions were denied because they did not make showings sufficient to entitle him to the post-conviction discovery sought. Petitions filed by the defendant, pursuant to the “gatekeeper” provisions of G.L.c. 278, §33E, for leave to appeal the denials of his new trial motions and requests for post-conviction discovery were also denied.[5]
In December 2008, the defendant filed the present new trial motion (his fourth), asserting newly discovered evidence that Alfred Gaynor killed Amy and Destiny Smith. In support of his motion, the defendant filed an affidavit by Gaynor confessing to killing the Smiths and an affidavit of Attorney Linda Thompson (Gaynor’s former counsel) stating that Gaynor admitted to her and her investigator, in May 1998, that “he individually was responsible for the deaths of Amy and Destiny Smith in July of 1996.”[6]

I. Summary of Evidence at Defendant’s Trial

The evidence introduced during the defendant’s 1997 trial, as set forth in the summation of facts in the Supreme Judicial Court’s decision on the defendant’s direct appeal, Commonwealth v. Fickling, 434 Mass. at 10-13, supplemented by other facts as relevant to this decision, is set forth below.
On July 11, 1996, members of the Springfield Police Department discovered the bodies of twenty-year-old Amy Smith (Amy) and her twenty-two-month-old daughter, Destiny Smith (Destiny), in their Springfield apartment.[7] They found Amy’s nude body in a closet, with her legs splayed and protruding, her hands bound with a brassiere, her face covered by a stroller and clothing, and a sock stuffed inside her mouth. Her body was in an advanced state of decomposition. The autopsy revealed that Amy died from asphyxia, either from strangulation due to a choke hold around her neck or from suffocation caused by the sock in her mouth.[8] Destiny was found lying on a mattress near her mother. The autopsy revealed that Destiny died from combined effects of starvation and dehydration. The police found no evidence of forced entry or robbery in the apartment, and found a protective order in the apartment barring the defendant from any contact with either Amy or Destiny. Shortly after the senior investigating officer dispatched other officers to locate him, the defendant approached the rear porch door of the apartment and angrily demanded to see Destiny. The police arrested the defendant on an unrelated outstanding warrant.
That evening, at approximately 7:00 p.m., Detectives Anthony Pioggia and Raymond Muise began interviewing the defendant. After initially claiming that the protective order and the outstanding warrant were for his incarcerated twin brother, the defendant admitted that the protective order issued against him was the result of an incident in which he struck Amy while they lived together prior to and shortly after Destiny’s birth. The detectives asked if the defendant knew who could have committed the crimes and inquired about his most recent contacts with the victims. During questioning, police confronted the defendant with inconsistencies in his statements. After the defendant told police he had last seen Amy one month before her death, police informed him they had spoken to a person who saw him near Amy’s apartment a few days before her death. The defendant then told police that Amy had paged him and that he went to her apartment to give her money for the baby’s needs. Police later *53 confronted the defendant with information suggesting that the defendant possessed no pager.
At one point, during further questioning, the detectives alleged the defendant stated, “Excuse me, all right, I did it,” and added that he hit Amy a couple of times and then choked her.[9] All statements attributed to the defendant during the first several hours of the questioning had been verbal. The detectives then took two separate written statements and an addendum to the second statement, each of which the defendant signed. The verbal and written statements were admitted into evidence at trial.
The police began taking the first written statement at approximately 10:30 p.m. That statement contained the following assertions. Amy obtained the protective order because the defendant had slapped her “a couple of times.” On July 5, 1996, the defendant went to Amy’s apartment with John Belton (“Belton”). The defendant and Amy argued, and he eventually grabbed Amy in a headlock and squeezed her for about 2-3 minutes. When he released her, she fell to the mattress and swore at him. He left the apartment after Belton told him he was going to “stash” Amy.
After the defendant signed the first statement, the detectives confronted him with alleged inconsistencies. The defendant’s second written statement began at approximately 1:00 a.m. In the statement the defendant added that after he choked Amy, he observed Belton hit and punch Amy in the face and head, and hold her lips shut until she lapsed into unconsciousness. He left the apartment to dispose of Destiny’s soiled diapers and when he returned he saw Belton inserting his fingers into Amy’s vagina while fondling her breasts. She remained unresponsive. Belton then said that he was going to “stash” Amy, and dragged her to the closet and placed her inside. The defendant said that he then left by the back door and Belton followed him a few minutes later. In an addendum to the second statement, the defendant added that he returned to the apartment on July 9th because he knew that Destiny was there and that Amy was dead. He did not enter the apartment because he did not want to attract the attention of the neighbors.
The jury heard testimony from Amy’s neighbors and friends and from others that in 1995 and 1996, the defendant and Amy had engaged in violent physical fights, that the defendant asked other individuals to fight with and hurt Amy, and that he was angiy about the restraining order Amy obtained against him.
The juiy also received evidence that forensic testing indicated that a human head hair recovered from the sock found in Amy’s mouth could have originated from Belton but not from the defendant. Those test results were received days before the defendant’s case was originally scheduled for trial in June 1997.
During trial, the defendant’s counsel directly challenged the credibility of the detectives’ claims that the defendant made the statements attributed to him, suggesting the police detectives tricked the defendant into making certain statements and fabricated statements in order to strengthen a weak case against the defendant. He also challenged the voluntariness of any statements.

II. Evidence Introduced in Hearings and Filings on New Trial Motion

A. Alfred Gaynor

On September 26, 2008, Alfred Gaynor (“Gaynor”) signed a single-page affidavit in which he took responsibility for the deaths of Amy and Destiny Smith. In that affidavit, Gaynor stated that on July 3, 1996, he ran out of money while drinking beer and smoking crack cocaine. He gained entry to Amy Smith’s apartment by asking to use her bathroom. When he asked to borrow money, she said she had only food stamps. When she declined his request to lend them to him, Gaynor became angry. He raped and killed Amy and took $79 worth of food stamps. He “broke the handle from the vacume [sic] cleaner and used that on her as well.” Gaynor also stated that the defendant “had nothing to do with these crimes.”
Later, during questioning in late December 2008 by investigating officers[10] and during his in-court testimony, Gaynor again asserted that he acted alone in killing Amy Smith. During hearings on the present motion, Gaynor testified that crack cocaine use during the relevant time periods motivated his conduct. He stated that he went to Amy Smith’s apartment for the purpose of getting money to purchase drugs. When he requested food stamps, she declined his request. Upset, he put her in a headlock from behind until she became unconscious. Then he sexually assaulted her, ejaculated into a t-shirt (which he took with him) so he would leave no evidence at the scene, and killed her before she regained consciousness.
Gaynor provided more details about Amy Smith’s death during the December 2008 police interview.[11] Then he stated that on the day of the incident he cashed his pay check, purchased drugs, and got high from crack cocaine, “a little pot” and alcohol. When he ran out of money, he went to Amy Smith’s apartment[12] for the purpose of getting money to purchase drugs. There, he used her bathroom and engaged in general conversation with her before asking her for money. Amy said she only had food stamps and declined to give them to him. Gaynor played with her daughter, continued their “small talk” and asked again for money. Amy told Gaynor she had clothing belonging to Fielding[13] and when she went toward the closet, Gaynor came behind her and choked her. When she became unconscious, he laid her down with her head “basically in the closet.” He removed her brassiere and used it to tie her hands together in the front. He removed the boxer shorts and panties she wore underneath, stuffed the panties into her mouth (so she wouldn’t cry out if she regained consciousness) and *54 raped her. He ejaculated into a t-shirt so he would leave no evidence behind. He broke off the handle of a vacuum cleaner, used it to penetrate her vaginally and anally and wiped the handle with the t-shirt. Concerned that he would go to prison if he left Amy alive, he choked her with his hands and left her body where it lay — partly in the closet. He denied that he put anything on top of her body. In order to remove fingerprints, he wiped areas in the apartment that he had touched. As he prepared to leave he saw people lighting firecrackers outside the apartment and he delayed his exit. He heard an automobile horn sounding and recognized his sister’s voice calling for Amy.[14] When his sister left the area, he took the food stamps (valued at $79.00) and a bottle of Pepsi and left the apartment. While leaving, he heard the baby crying and left the front door ajar “just a little bit” because he “didn’t want to leave the baby there to die.” Outside, and a short distance down the street, he threw away the t-shirt that he had used. Gaynor stated that he sold the food stamps for $40.00, bought drugs and got high. He stated that he never told Fickilng what he had done. In November 2008, he contacted Fickling’s attorney, Greg Shubert, and asked him to visit him at the prison. During the visit, Gaynor disclosed his responsibility for the Smith deaths.
During the hearing on the present motion, Gaynor testified that he attended and heard testimony during Fickling’s trial for the Smith killings. Gaynor testified that because he knew of Fickling’s innocence and assumed he would be acquitted, he told no one that he — and not Fickling — was responsible for the deaths of Amy and Destiny Smith. He did not attend court at the time of the jury verdict but, instead “bur[ied] my feelings by doing what I do best, crack.” Before, during and after trial, he did not admit responsibility to Fickling or to their family members. However, shortly after Fickling’s conviction, Gaynor admitted his responsibility to “an old friend” Willie Crapps when they “had a few beers and smoke(d) a little pot and eventually smoked some crack.”
According to Gaynor, he spoke with Fickling about his case while both were imprisoned,[15] but not in detail, and that he did not tell Fickling of his role in the Smith deaths. During a conversation, Fickling told Gaynor that he made a false confession because of police coercion and trickery. During his December 29, 2008 interview, Gaynor stated that he fought efforts to move him into the same prison unit as the defendant and, once there, he never dealt closely with the defendant, “never hung with him,” and might have walked one time with him in the yard. He also told the officers that he requested transfer from the unit because he did not know how the defendant would react when he learned of his confession.
Gaynor testified that in 1998, before trial of the homicide charges against him, he told Attorney Thompson and her investigator David Tetreault (“Tetreault”) that he killed Amy Smith. He acknowledged that he told them that he went to Amy’s apartment because he had a sexual interest in her and believed that she “fancied” him and that he told Tetreault that he killed Amy because she was struggling against him. Gaynor explained that he “stretched” the facts to his attorney and investigator because he “was embarrassed and I didn’t want it to appear that I was a monster ...”

B. Investigator David Tetreault

During their investigation of the deaths of several women in the city of Springfield between October 1997 and February 1998, Springfield police officers began to focus the investigation on Gaynor.
Tetreault is a private investigator with twenty years experience. As a result of significant media attention surrounding the deaths, he became aware of the unsolved cases and the investigation and, at some point, learned of the police focus on Gaynor. He knew of Gaynor, whom he met with briefly during Fickling’s trial (on which he was working as the defense investigator) and also while assisting an attorney in another matter. Tetreault learned that police had established surveillance of Gaynor and had spoken with him. He understood the police were seeking to obtain blood samples from a number of individuals, including Gaynor. Because he believed that Gaynor needed advice from counsel, Tetreault contacted either Attorney Linda Thompson or the Committee for Public Counsel Services (“CPCS”). Thereafter, when Attorney Thompson began advising and representing Gaynor, Tetreault assisted as her investigator.
Tetreault spoke several times with Gaynor during the police investigation and before his arrest. During a discussion regarding why Gaynor had voluntarily provided a blood sample to police officers, Tetreault explained DNA analysis because Gaynor appeared not to understand it.[16] Tetreault advised Gaynor that a scientific laboratory would be testing a number of items obtained by the police during their investigation and that once they received the DNA test results, the police would likely have probable cause to arrest him. It appears that during this period of the ongoing police investigation, Gaynor made no admissions to Tetreault that he had killed anyone.
On May 20, 1998, shortly after Gaynor’s arraignment in the Springfield District Court on complaints charging him with the murders of Rosemary Downs and Joyce Dickerson, Tetreault and Attorney Thompson visited Gaynor at the House of Correction. They discussed with him the discovery they had received from the prosecution. Tetreault questioned Gaynor specifically about his involvement in the Downs and Dickerson killings and his involvement in other killings with which he had not yet been charged. Gaynor admitted he killed the two women with whose deaths he had been charged and also admitted his responsibility for the deaths of other women, including Joanne *55 Thomas. Gaynor explained that he made arrangements with the women whereby he would agree to furnish or share crack cocaine with them in exchange for their sexual favors or for them sharing their own crack with him. If the women “held back" he engaged in sexual acts with them that ultimately ended in their deaths.
During this interview, Tetreault directly confronted Gaynor about whether he had involvement in the. Smith killings. As Tetreault recalled, Gaynor responded that he had gone to Amy Smith’s apartment on a few occasions with Fickling and alone. He had gone there after procuring crack, in order to smoke crack and get high.[17] Gaynor stated that on the day of Amy Smith’s death he went to her apartment to get high. Gaynor explained that after smoking his crack he believed she was holding back her own cocaine and also that she fancied him, so he attacked her. Gaynor stated that he acted alone in killing Amy Smith.
Tetreault then advised Gaynor that he should “do the right thing” with regard to Fickling because at that point, based on Gaynor’s statements, Tetreault assumed Fickl-ing was imprisoned for a crime he did not commit. Tetreault suggested that he would prepare an affidavit which Gaynor could sign in the presence of a notary and, further, that he would do nothing with the affidavit until after the conclusion of Gaynor’s trial. Gaynor agreed that Tetreault could prepare an affidavit, but he refused to sign it. Tetreault proposed that he would secure the affidavit in his office safe and would not release it without Gaynor’s assent; further, if Gaynor agreed to release the affidavit at a later date, Tetreault would bring it to the attention of the District Attorney at that time. Additionally, if Gaynor were to be acquitted of the charges, Tetreault would return the affidavit to Gaynor. Gaynor indicated he had no problem with Tetreault’s proposal.
On May 22,1998, Tetreault prepared his own affidavit which he signed before a notary public. He placed the affidavit in his office safe and did not disclose its contents to anyone until Gaynor signed a release permitting him to do so in or about November 2008. In pertinent part, the affidavit states that Gaynor advised Tetreault that: he killed Amy Smith on July 5, 1996; he thought she liked him and she was “kinda a slut anyway"; he did so after raping her and ejaculating into a rag which he took with him; the fact that she kept struggling and his fear that she would later identify him to the police forced him to take her life; Fickling had no involvement in the crime; and if he were found guilty of any of the three homicides with which he was then charged he wanted the information brought forward.
C. Alfred Gaynor’s First Attorney
After Gaynor supplied a blood sample but before institution of any formal charges, CPCS assigned Attorney Linda Thompson to advise Gaynor. Attorney Thompson first met with Gaynor in her office, with Tetreault present. At some point thereafter, police arrested Gaynor but initially charged him only with the deaths of Rosemary Downs and Joyce Dickerson. Attorney Thompson was appointed to represent him in those two matters in the Springfield District Court, but understood other charges might be forthcoming.
On May 20, 1998, early in her representation of Gaynor, while the Downs and Dickerson homicide charges remained pending in the District Court and before any grand jury indictments issued, Attorney Thompson and Tetreault met with Gaynor at the House of Correction to review and discuss the discovery and evidence. At that time, Attorney Thompson was concerned that Gaynor could be charged with other offenses. Tetreault confronted Gaynor regarding whether he had involvement in the Downs and Dickerson killings. During that conversation, Tetreault also confronted Gaynor about the Amy and Destiny Smith deaths. Even though Attorney Thompson understood that Tetreault had assisted the defense at the Fickling trial, she knew little about the case. Gaynor volunteered that he was the person who killed Amy Smith. In her testimony, Attorney Thompson recalled Gaynor stating that he went to visit Amy Smith because he believed she “fancied” him, but he was wrong, which lead to difficulties which in turn ended with her death. Attorney Thompson recalled Gaynor giving no other details. Gaynor told her that he attended Fielding’s trial but said nothing because he knew Fickling had no involvement in the deaths of Amy and Destiny Smith and also thought Fickling would not be convicted.
Attorney Thompson continued her representation of Gaynor in Superior Court when a grand juiy returned indictments charging Gaynor in the Downs and Dickerson deaths. Later, when the grand jury returned indictments charging Gaynor in the death of Joanne Thomas, she was assigned to represent him on that case as well. Focusing her attention on the charges on which she had been appointed to represent Gaynor, Attorney Thompson did not inquire further about the Smith deaths. Attorney Thompson withdrew from her representation of Gaynor before his trial.

D. Alfred Gaynor’s Trial Counsel

Then-Attorney Cornelius J. Moriarty[18] represented Gaynor before and during trial of the indictments charging him with the murders of the four women. He was initially appointed, in the spring of 1999, only on indictments charging Gaynor with the rape and murder of Loretta Daniels, but later assumed representation of Gaynor on all his pending charges. From discovery furnished by the prosecution, Attorney Moriarty was aware of two additional deaths with which Gaynor had not been charged but to which police had some suspicion he might be connected. Then, some months into his representation of Gaynor but before trial,[19] he also learned from an investigator that Attorney Greg Shubert (Fickling’s trial attorney) was asserting that Gaynor was also responsible for the deaths of Amy and Destiny Smith. Because he had received no discovery related to the Smith deaths from the prosecution, Attorney Moriarty had no immediate concern. Nevertheless, as the *56 trial date approached, and out of an abundance of caution, he discussed the accusations with Gaynor and asked Gaynor for permission to inquire of the District Attorney if facts related to the Smith case were likely to arise at trial. Gaynor assented. Gaynor said nothing to Attorney Moriarty about whether he was or was not responsible for the deaths of Amy and Destiny Smith.
During a subsequent meeting before Gaynor’s trial, Attorney Moriarty sought to learn if information regarding the Smith deaths would arise during trial and asked District Attorney William Bennett if he believed the correct person had been convicted in the Smith killings. The District Attorney responded that police officers had some thought that Gaynor might have involvement in the Smith deaths. He also asserted that he was confident that the right person had been convicted because Fickl-ing had confessed and, in any event, the prosecution had tried the case as a joint venture.

E.Scientific Testing in 1997 by the State Police Crime Laboratory

During investigation of the Smith deaths, law enforcement officials secured evidence later submitted for forensic analysis to the Massachusetts State Police Crime Laboratory. There, Elizabeth Fisher, a chemist, analyzed hairs collected at the scene from a white t-shirt (located in a bedroom), a sock and a white sheet. After microscopic comparison of those hairs to head and pubic hair standards taken from Amy Smith, Fickling and Belton, she concluded as follows: (1) two pubic hairs she examined from inside and outside the t-shirt could not have originated from either Fickling or Belton; (2) a human pubic hair from the sock could not have originated from either Fickling or Belton; (3) a human head hair from the sock could not have originated from Fickling but could have originated from Belton; and (4) two human head hairs from the white sheet could not have originated from either Fickling or Belton.
During analysis, other chemists detected sperm cells in stains on a mattress cover and comforter found in a bedroom. Testing for sperm cells and seminal fluid on other items, including vaginal and ano-rectal swabs and smears taken from Amy Smith, had negative results.

F.Scientific Testing in 2009 by the State Police Forensic and Technology Center

After the defendant filed the present new trial motion, the parties agreed to DNA-STR testing at the Massachusetts State Police Forensic and Technology Center of certain other items secured during investigation of the Smith deaths. Kathleen Gould (“Gould”), the DNA analyst, compared those items to: (1) known blood standards of Fickling, Belton and Destiny Smith, (2) pubic hair standards of Amy Smith, and (3) known saliva standards of Gaynor. She reached the following conclusions: (1) Fickling could have been the source of male DNA identified on sperm fraction stains from a mattress cover and a comforter; (2) Fickling could have been the source of male DNA identified from cigarette butts; (3) Amy Smith could have been the source of major female DNA and Fickling could have been a potential contributor of minor DNA identified from a non-sperm stain from the comforter which Gould concluded was a mixture of DNA from at least two individuals; (4) Amy Smith, Destiny Smith and Fickl-ing could have been potential contributors of the mixture of DNA from at least three individuals identified from a mattress cover stain; (5) the DNA profile obtained from a swab of scissors handles indicated a mixture of DNA from more than one source, and the major male profile in the mixture was from an unknown source; (6) the DNA profile obtained from a swab of left hand fingernail cuttings indicated a mixture of DNA from more than one source, and the major female profile could have been Amy Smith and the minor DNA profile had insufficient data to reach any conclusion as to inclusion or exclusion of Destiny Smith as the source; (7) the DNA profile obtained from a swab of right hand fingernail cuttings indicated a mixture of DNA from at least two individuals and Amy Smith and Destiny Smith were included as possible contributors; (8) the Y-STR DNA profile from a swab of a box fan handle and cord indicated a mixture of DNA from at least two males, but contained insufficient data to reach any conclusions as to inclusion or exclusion of Fickling, Belton and Gaynor as sources; (9) the autosomal STR-DNA profile identified a swab of the box fan handle and cord contained insufficient data to reach any conclusions as to inclusion or exclusion of Amy Smith, Destiny Smith, Fickling, Belton or Gaynor as sources; (10) the Y-STR DNA profile from a swab of a cord indicated a mixture of DNA from at least three males, but contained insufficient data to reach any conclusions as to inclusion or exclusion of Fickling, Belton and Gaynor as sources; (11) the autosomal STR-DNA profile identified from the swab of the cord contained insufficient data to reach any conclusions as to inclusion or exclusion of Amy Smith, Destiny Smith, Fickling, Belton or Gaynor as sources; and (12) insufficient DNA for STR fragment analysis was extracted from a swatch of a stained area of a chain.

G.Scientific Testing in 2009 by Serological Research Institute

Brian Wraxall, the chief forensic serologist at the Serological Research Institute, conducted DNA analysis of evidence which was introduced during trial of the indictments against Gaynor. With regard to the present new trial motion, the Commonwealth and the defendant’s attorney agreed that Dr. Wraxall would conduct a forensic examination and DNA analysis of eighteen items related to the Smith killings: a sock, cuttings from a sock, a brassiere, cuttings from a brassiere, a vaginal smear, vaginal swabs and rectal swabs from Amy Smith’s body and hairs from a sock and brassiere. For comparison purposes, Dr. Wraxall received buccal references for Fickling and Gaynor and blood references for Amy and Destiny Smith and Belton.
*57 Dr. Wraxall detected no male DNA on the vaginal swabs or the brassiere. He concluded that a light brown hair from a sock (identified as Item 7-3A)[20] did not originate from Fickling, Belton, Gaynor, Amy Smith or Destiny Smith. He described the mitochondrial DNA sequence from a dark brown “possibly pubic hair” from a sock (identified as Item 7-3B)[21] as differing at one base from DNA sequences for Fickling and Gaynor, who he noted were maternally related. In his opinion, “(b]ecause this could be a result of heteroplasmy[22] at base 252 in the sequence from the hair . . . the hair could have originated from Paul Fickling or Alfred Gaynor or any of their maternal relatives.” He concluded that the hair did not originate from Belton, Amy Smith or Destiny Smith.

DISCUSSION

“A judge may grant a new trial at any time if it appears that justice may not have been done.” Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979). The principles governing a motion for a new trial based on newly discovered evidence are well-established and are set forth in Commonwealth v. Grace, 397 Mass. 303, 305-06 (1986). “A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction. The evidence said to be new not only must be material and credible but also must carry a measure of strength in support of the defendant’s position.” Id. at 305. Put another way, the evidence must be “potent, pertinent, and creditworthy to fundamental issues in the case.” Commonwealth v. Cintron, 435 Mass. 509, 517 (2001).
Before ordering a new trial, the judge “must find that there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial. The strength of the case against the criminal defendant, therefore, may weaken the effect of evidence which is admittedly newly discovered. The motion judge decides not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury’s deliberations.” Grace, 397 Mass. at 306. A motion judge who was also the trial judge “is in the best possible position to weigh the credibility of the proffered evidence and to assess its probable impact on a jury.” Commonwealth v. Brown, 378 Mass. 165, 171-72 (1979). “Not only must the allegedly new evidence demonstrate the materiality, weight, and significance that we have described, but it must also have been unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial (or at the time of the presentation of an earlier motion for a new trial).” Grace, 397 Mass. at 306. “The Commonwealth has an interest in ending litigation once a case has been fully and fairly tried. A party seeking a new trial on the ground of newly discovered evidence must overcome this interest in finality by showing both the importance and the newness of that evidence." Id.
Here, Gaynor’s confession is newly discovered. Until Gaynor admitted his role in the Smith deaths and waived his attorney-client privilege regarding his conversations with the attorneys and investigator who assisted in his defense in the Downs, Dickerson, Thomas and Daniels murders, Fickling had only elements of similarity between those deaths and the Smith deaths, and Gaynor’s familial connection (through Fickling) with Amy and Destiny Smith to support his argument that Gaynor killed them.
In opposing the defendant’s present motion for a new trial, the Commonwealth argues that the defendant has failed to show that the new evidence casts real doubt on the justice of the conviction because: (1) there is substantial evidence of the defendant’s guilt supporting his conviction as both a principal and joint venture; (2) there are significant dissimilarities between the four Gaynor murders and the Smith murders, and (3) Gaynor, a convicted four-time murderer and uncle to the defendant, demonstrated that he is not credible and should not be believed.
During trial of the indictments against him, the jury received significant evidence pointing to the defendant’s guilt, including hostility toward Amy Smith and his opportunity to engage in the conduct alleged. Most critical were his statements to the police, which placed him at the scene at the time of Amy Smith’s death. The focus of the defense at trial was whether the signed statements and the reported oral admissions that he choked Amy Smith and that he “did it” were genuine, truthful and made voluntarily. Commonwealth v. Fickling, 434 Mass. at 16. The timing and circumstances under which the prosecution produced in discovery the most potent statement attributed to the defendant (that he “did it”) enabled his counsel to argue, with great force, that the jury should not believe police detectives’ claims that the defendant made that admission. Furthermore, the placement of that statement within the police report provided further ammunition for his counsel to make a very plausible claim that the police detectives inserted the alleged admission.[23] If it had been available at the time of trial, evidence of Gaynor’s admission that he alone was responsible for the deaths of Amy and Destiny Smith would probably have been a real and significant factor on this issue duringjuror deliberations.
The Commonwealth’s argument that a number of factors cloud Gaynor’s credibility has some force. Gaynor’s motivation for killing Amy Smith differed in his telling. In May 1998, shortly after his arrest, Gaynor told Attorney Thompson that he believed -Amy Smith “fancied” him and, when he discovered otherwise, he raped and killed her. Tetreault recalled Gaynor stating that after he and Amy Smith smoked crack, he attacked her because he believed she was holding back her own cocaine and “fancied” him, and he killed her because she was struggling against him. Gaynor now maintains that his only motivation was anger at Amy Smith’s refusal to give money or food stamps that would enable him to buy *58 more crack cocaine. He explained his 1998 description of the events as intended to “soften” the facts he related to his defense attorney and investigator because of embarrassment about what he had done and his desire not to appear to be a “monster.”
Furthermore, Gaynor’s description of the events surrounding Amy Smith’s death is contradicted by one aspect of the evidence. In December 2009, he told police officers that he stuffed a pair of panties into Amy Smith’s throat after choking her. However, police found a sock— not panties — in her throat. The Commonwealth also argues that Gaynor’s detailed description of the events surrounding Amy Smith’s death can be explained by: (1) his attendance during the defendant’s trial (during which he would have learned the results of the police investigation), (2) family discussions about the case, and (3) the fact that, following their respective convictions, he and the defendant were incarcerated for a period of time in the same prison unit. Furthermore, the Commonwealth suggests, Gaynor has little to lose by accepting blame for the Smith deaths: he is serving four consecutive life sentences after his convictions in the deaths of Thomas, Daniels, Downs and Dickerson, all of which have been affirmed after appeal, and he expects to spend the remainder of his life in prison.
The Commonwealth also points to variations in the explanation offered by Gaynor for killing Thomas, Daniels, Downs and Dickerson. It stresses that there were significant differences between those four murders and the Smith killings,[24] which occurred fifteen months earlier. It places particular emphasis on the lack of evidence of Gaynor’s fingerprints and bodily fluids at the Smith murder scene[25] and that in contrast to Gaynor’s assertion that he removed all evidence of his presence from that scene in order to escape apprehension, Gaynor left significant amounts of physical evidence (primarily bodily fluids) which connected him to the later killings.
Inescapable, however, are the significant similarities between Amy Smith’s death and the deaths of Thomas, Daniels, Downs and Dickerson,[26] all of whom were killed in Springfield (where Gaynor lived), between July 1996 and February 1998. All died of asphyxiation and were found naked or nearly naked. There was evidence of sexual assaults upon Thomas, Daniels, Downs and Dickerson. Gaynor claimed that he also sexually assaulted with his penis and a vacuum handle Amy Smith (whose severely decomposed body may have made forensic detection of penetration difficult[27]). Amy Smith and three of the other victims were found restrained or tied with their own clothing. The bodies of Rosemary Downs, Lorretta Daniels and Amy Smith were left in similar positions: with their legs fully parted and their genitals exposed. Rosemary Downs, like Amy Smith, was found with a sock in her mouth. The distinctive manner in which Gaynor left each of his victims, when equipoised with the manner in which Amy Smith’s killer left her body, lends credence to Gaynor’s admission that he also killed Amy Smith.
The Commonwealth asserts that forensic evidence also cuts against the credibility of Gaynor’s confession, noting that crime scene investigators found no physical evidence linking Gaynor to the scene. Specifically, it asserts that in a comparison of fingerprint impressions lifted at the time of the investigation from a number of objects within the Smiths’ apartment (which included the closet door, the stroller, refrigerator, scissors, a torn letter and ornaments), none matched those of Gaynor. Again, Gaynor has claimed that before he left the Smiths’ apartment he wiped surfaces that he might have touched.[28]
The Commonwealth also points to the results of DNA testing conducted in 2009 by Dr. Wraxall and by the State Police Forensic and Technology Center as further evidence that tends to counter Gaynor’s claims of responsibility. With one exception, those findings exclude Gaynor as a possible source or contributor (or insufficient data permitted the analyst to reach any conclusion) to male DNA. As to one hair, Dr. Wraxall opined that it “could have originated from Paul Fickling or Alfred Gaynor or any of their maternal relatives.” However, because of the broad nature of that opinion it provides little (if any) corroboration for Gaynor’s confession.
During testing at the Massachusetts State Police Crime Laboratory in 1997, no seminal fluid or sperm cells were detected on vaginal and ano-rectal swabs and smear slides. Dr. Wraxall also detected no male DNA during his 2009 examination of vaginal swabs and a brassiere. Those findings do not wholly contradict Gaynor’s claim that he raped Amy Smith because he also claims that he ejaculated into a t-shirt which he discarded after leaving the Smith apartment.
Testing at the State Police Forensic and Technology Center also indicate that the defendant could have been the source of sperm stains on a comforter and mattress cover, and of male DNA on cigarette butts. The same testing indicated that the defendant was a potential contributor to mixtures of DNA from non-sperm cells on the comforter and mattress cover. Notably, no evidence introduced at trial suggested that acts of physical and/or sexual violence committed upon Amy Smith took place on her bed. Furthermore, the results of the analysis do not disclose the age of stains on the comforter and mattress cover. Considering the relationship between the defendant and Amy and Destiny Smith, one could reasonably expect to have found in the apartment evidence of the defendant’s presence (such as on cigarette butts) or of the defendant’s bodily fluids, which could have been left or deposited on any number of dates before July 5, 1997 under circumstances completely unrelated to the Smith deaths.
Gaynor formally confessed to killing Amy Smith in 2008, twelve years after her death and eleven years after a juiy convicted Gaynor’s nephew of killing her and their daughter Destiny. Such a delayed disclosure, especially under circumstances as in this case, would in most instances be a reasonable ground for *59 scepticism and rejection. Nevertheless, in this instance it is of some considerable significance that Gaynor does not make these claims for the first time. As the evidence demonstrates, he made admissions of his guilt in 1998 to his attorney and investigator, whose ethical obligations bound them to keep those admissions secret. Furthermore, he made the admissions at a point when he seemed to have little to gain from telling his attorney and investigator that he had committed yet another horrific crime.
The Commonwealth also asserts that because the jury could have found the defendant liable as a joint venturer based on his own statements placing him at the scene, whether the defendant or another person actually choked Amy Smith or put a sock in her mouth has no significance. Although the law does not require that the prosecution prove the identity of the actual perpetrator, see Commonwealth v. Drumgold, 423 Mass. 230, 254 (1996), in this case, the defendant’s own statements implicating John Belton (corroborated to some degree by evidence that microscopic comparison of a head hair found on the sock in Amy Smith’s mouth indicated it could have originated from Belton) were the sole basis for submitting the case to the jury on the theory that the defendant acted as a joint venturer. The Commonwealth presented no other evidence suggesting involvement by Belton or any other person in the Smith deaths.[29], [30]
The Commonwealth argues that the defendant’s own statements furnished irrefutable evidence of his guilt because he “provided details of the crime to the police that only the killer could have known.” The Commonwealth contends that even with Gaynor’s confession, evidence of the defendant’s presence and conduct at the scene (as described in his own statements) is sufficient to support his conviction as a joint venturer in Amy Smith’s death. That argument overlooks the fact that if a jury believed Gaynor’s confession but also believed that the defendant was present and participated to some degree in the assault upon Amy Smith that led to her death, the jury would still need to determine the degree of murder of which it found the defendant guilty. See G.L.c. 265, §1 (“The degree of guilt shall be found by the juiy”).
Finally, the Commonwealth argues that even if the court determines that Gaynor’s admission that he killed Amy Smith entitles the defendant to a new trial, the court should separately consider the verdict on the indictment charging the defendant with the death of Destiny Smith. Whether to allow a new trial on that verdict presents a closer question, because it was not necessary that the jury find the defendant guilty as either the principal or a joint venturer in Amy Smith’s death in order to convict him of Destiny Smith’s death.
In his statements introduced at trial, the defendant acknowledged that he knew his infant daughter was alone in the apartment with her dead or dying mother and that he did not enter the apartment when he returned on July 9th because he did not want to attract the attention of neighbors. The jury found him guilty of murder in the first degree of Destiny Smith by reason of extreme atrocity or cruelty. As the Court noted in the defendant’s direct appeal, “the determination whether an unlawful killing was perpetrated with extreme atrocity or cruelty ‘focuses both on the defendant’s actions, in terms of the manner and means of inflicting death, and on the resulting effect on the victim, in terms of the extent of physical injury and the degree of suffering endured.’ ” Commonwealth v. Fickling, 434 Mass. at 15, quoting Commonwealth v. Judge, 420 Mass. 433, 442 (1995), quoting Commonwealth v. Lacy, 371 Mass. 363, 367 (1976). The evidence at trial permitted the jury to find that the twenty-two month old child was left alone in an apartment with a locked door and windows in July, and that the defendant made no efforts either to provide care for his daughter or to alert anyone of her circumstances. Expert testimony indicated that she would have been conscious and suffering in the days before she died of dehydration and starvation. Based on those facts as presented at trial, the jury could have found the defendant guiliy for the death of Destiny even if it had returned a not guilty verdict for Amy’s death. Nonetheless, it bears repeating that the entire focus of the defense was that the verbal and written statements attributed to the defendant were neither truthful nor voluntary and that the police thrust the admissions upon the defendant and that they embellished or manufactured other of his statements because they lacked sufficient other evidence to charge and convict the defendant. Contrary to the Commonwealth’s suggestion, the defendant did not concede at trial that he was present at the time of Amy Smith’s death.[31] If the jury heard Gaynor’s testimony that the defendant was not present and that he acted alone in killing Amy Smith, that testimony would probably have been a real factor in the jury’s deliberations regarding whether the defendant made the verbal and written admissions attributed to him. Gaynor’s testimony that he acted alone, if believed by the jury, would have been a real factor in their deliberations as to the defendant’s responsibility for Destiny’s death.
The victims of these deplorable crimes and the people of this Commonwealth have a clear interest in the finality of the verdicts in this case and the court does not lightly disturb those verdicts. Nonetheless, because this newly discovered evidence “casts real doubt” on the justice of the defendant’s convictions, Commonwealth v. Grace, 397 Mass. at 305, and there is a substantial risk that the jury would have reached a different conclusion if evidence of Gaynor’s confession had been introduced during trial, id. at 306, the defendant’s motion seeking a new trial shall be granted.

ORDER

For the reasons set forth above, the defendant’s motion for new trial is allowed.

 For the sake of brevity, only those events most pertinent to the present motion are set forth below.

 Hampden County Superior Court Crim. A. Nos. 98-0965 through 98-0970 and 99-0729 through 99-0730.

 Those new trial motions also raised other grounds not directly pertinent to the present motion.

 Attorney Thompson represented Gaynor in three of the murder accusations: the deaths of Joanne Thomas, Rosemary Downs and Joyce Dickerson. She sought to withdraw from representation of Gaynor but declined to state her reasons, asserting attorney-client privilege. Following a closed hearing before Superior Court Judge Thomas Curley, she appealed the matter to a single justice of the Supreme Judicial Court. For reasons not made clear by the record before me, Attorneys Cornelius J. Moriarty and Harry L. Miles, who represented Gaynor in a fourth case (the death of Loretta Daniels) took over representation of Gaynor from Attorney Thompson.

 Defendant’s applications were denied on July 16, 2004 (by Justice John Greaney) and on July 11, 2007 (by Justice Robert Cordy).

 On November 5, 2008, Gaynor signed a written waiver of the attorney-client privilege that existed between him and Attorney Linda Thompson, Attorney John Thompson and their investigator David Tetreault. Attorney Linda Thompson’s affidavit is dated December 2, 2008.

 Use of the deceased victims’ first names is intended for the sake of clarity and not out of disrespect.

 The medical examiner opined that Amy died approximately one week before discovery of her body. The condition of her body precluded determination of a more definitive cause of death or whether she had suffered other injuries.

 The prosecution did not furnish this statement in discovery until late April 1997, nearly ten months after the defendant’s arrest. The defendant contended before and during trial that the police had fabricated this statement.

 Following the defendant’s submission of Gaynor’s written admission that he killed Amy Smith, two Springfield Police Detectives interviewed Gaynor at the Old Colony Correctional Center. The Hampden District Attorney and Gaynor’s appointed counsel, Attorney Peter Ettenberg, attended the December 29, 2008 interview.

 A transcript of the interview was admitted as Exhibit 6.

 During the interview, he stated that he knew where Amy lived but went inside her apartment only on this occasion.

 Gaynor surmised that because Amy had obtained a restraining order, she wanted him to return the clothing to Fickling.

 The defendant’s mother is one of Gaynor’s sisters.

 Gaynor described the location as “the max, the super max,” presumably the Department of Corrections maximum security facility.

 Tetreault recalled that Gaynor said he had no concerns about giving a blood sample as he had not bled on anyone. Tetreault explained that DNA analysis of his blood would enable the laboratory to make comparisons to other bodily fluids found at a crime scene.

 Tetreault had inferred that Amy Smith also smoked crack cocaine on those occasions, but acknowledged during his testimony that he did not recall Gaynor stating that she engaged in that conduct.

 vJudge Moriarty is presently an associate justice of the Superior Court.

 Described at hearing as “late in the scheme of things.”

 He described that hair as having a root and measuring approximately 6 centimeters long.

 He described the second hair as having no root and measuring approximately 4 centimeters long.

 Heteroplasmy is the existence of normal and mutant mitochondrial DNA molecules within a single cell.

 Counsel argued that the lack of punctuation marks at the end of the sentence before and the lack of capitalization on the first word of the sentence that followed the admission was evidence that the detectives had manufactured this admission. He asserted that the detectives clumsily inserted this statement into an earlier report and then claimed it as their original report.

 Thomas, Daniels, Downs and Dickerson were African-American and older (aged 32-38) than Smith (who was Caucasian and 20 years old). They were known crack cocaine users, which Smith was not, and evidence indicated cocaine use before their deaths.

 Recent DNA analysis of evidence found at the Smith murder scene does not conclusively tie Gaynor to it. Dr. Brian Wraxall’s forensic analysis led him to conclude that a hair found on a sock could have originated from Gaynor but also from the defendant or other of their material relatives.

 Additional details of the circumstances surrounding the deaths of Amy Smith and the four Gaynor victims are set forth in table G3, G5, G7 and H of paper 177, entitled “Exhibits in Support of the Defendant’s Motion to Supplement his Motion for New Trial.” I do not repeat them here.

 During the testimony of Dr. Loren Mednick, the medical examiner who performed the autopsies, neither counsel inquired as to whether he observed any evidence of vaginal or anal penetration. Dr. Mednick testified that Amy Smith’s body was in advanced state of decomposition.

 It bears noting that the evidence adduced at trial also indicated that only one fingerprint (from an item located in the bathroom medicine cabinet) matched Fickling’s.

 The jury did not leam of other facts which arguably supported Belton’s involvement in the Smith deaths. On Monday August 11th, in the midst of trial, counsel reported that over the past weekend, Springfield police had interviewed a tenant at Colonial Estates about a conversation she overheard. Sarah Curto (“Curto”) had reported that on a Monday night earlier in the summer .she heard a loud conversation outside her apartment, during which a deep voiced male stated that he had raped and killed a “girl” in downtown Springfield and left her baby to die. He said the boyfriend was in jail and wouldn’t talk and that they strangled her. When Curto looked out of her window, she saw two women and two black men. The man with the deep voice wore a red cap. Curto made two noise complaints to the security office at Colonial Estates. A security officer responding to the complaint encountered Belton and three other individuals on the premises.
The trial was recessed at the defendant’s request to afford him an opportunity to locate Curto and to investigate the information. It appeared at first that Curto had left the area; however, on August 18th, she came before the court, appearing fearful and reluctant to cooperate. Ultimately, she indicated she would appear if summonsed; however, neither party called her to testify.

 Only the defendant was charged in the Smith killings. On August 15th, during trial, Belton appeared with his counsel (Attorney Jonathan Elliot) and indicated that he would not assert his Fifth Amendment privilege against self-incrimination if called to testify. Neither party called Belton to testify during the trial.

 Notably, in his final statement to the jury, the defendant’s counsel argued that “the only credible evidence in this entire case suggests that John Belton, acting alone, killed Amy Smith, and as a result, Destiny Smith died. That’s the only credible evidence that you have, a head hair consistent with John Belton, not [the defendant].”